UNITED STATES SUPREME COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

In the matter of the Application of

SHAMROCK BUILDING SYSTEMS, INC.,

        Petitioner,

For an Order pursuant to the Federal
Arbitration Act 9 U.S.C.A. § 1 et seq.,
Confirming an arbitration award

  -against-

ROSE REALTY CORP. and TEMPEST
REALTY CORP.

        Respondents.

--------------------------------------------------------------X

**CIVIL ACTION NO.
07CV3706(LBS)**


**AFFIDAVIT IN SUPPORT
OF CROSS PETITION TO
MODIFY OR VACATE
ARBITRATION AWARD**

STATE OF NEW YORK }
        }s.s.:
COUNTY OF NEW YORK }

   William A. Gogel, being duly sworn, deposes and says:


   1.  I am a partner in the law firm of Agulnick & Gogel, LLC, Attorney for

Respondents, Rose Realty Corp. and Tempest Realty Corp.

   2.  That I am fully familiar with the facts and circumstances set forth herein,

as I represented the Respondents in the underlying arbitration proceedings

   3.  That I make this affidavit in support of the Respondent's Cross Motion to

modify or vacate the arbitration award dated April, 26, 2007, or in the alternative for an

Order granting a rehearing; that I also make this affidavit in opposition to the Petitioner's Motion to Confirm the Arbitration Award.

      4.     The Respondent, Rose Realty Corp., hereinafter referred to as "Rose" is a corporation organized under the laws of the State of New York with its principal place of business located at 234 East 120th Street, New York, New York.

      5.     The Respondent, Tempest Realty Corp., hereinafter referred to as "Tempest" is a corporation organized under the laws of the STATE of New York, with its principal place of business located at 234 East 120th Street, New York, New York.

      6.     Upon information and belief, the Petitioner Shamrock Building Systems, Inc., hereinafter referred to as "Shamrock" is a corporation organized under the laws of the State of Georgia, whose principal place of business is located at 5825 Gore Place, Austell, Georgia, and is authorized to do business in the State of New York.

      7.     The jurisdiction of this Court is based upon Section 9 of Title 9 of the United States Code and Section 1332 of Title 28 of the United States Code. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

## THE EXECUTION OF THE CONTRACT

      8.     The AIA Contract with respect to the construction project at 234 East 120th Street, New York, New York was dated September 25, 2003. Said contract did not set forth the name of the owner of the project and left a blank space as to the name of the project owner. See copy of contract annexed as Exhibit "1" to the affidavit of Petitioner's Counsel, Joseph P. Assalta.

9.      The Respondent's principal, Daniel Moloney, signed the aforementioned AIA contract when he was hospitalized in Columbia Presbyterian Hospital from the complications of open heart surgery; while he was on heavy sedative medication; while he was barely conscious and when he was alone with petitioner's principal, Seamus Burke.

10.     The Respondent's principal, Daniel Moloney, testified that he had no recollection that he had signed the AIA contract while in the hospital. His signature on the contract did not set forth that he had signed in any representative capacity for any of the corporate respondents.

11.     Seamus Burke testified that the contract was signed by Daniel Moloney "in the hospital", that he was in the hospital because "he had some heart surgery" and stated, "I was aware he was seriously ill" (S. Burke testimony p.252). Burke claimed that the contract was sent to Daniel Moloney's office some three (3) weeks earlier and not sent to the hospital (S. Burke Testimony, p.253 256), Seamus Burke testified that he did not ask any nurse or doctor whether Moloney had the capacity of reading and understanding a contract (S. Burke testimony, p.256)

12.     Seamus Burke testified that he discussed the Contract with Moloney for a "few minutes, two, three minutes" (S. Burke Testimony, p.258); that he did not discuss the change order provision of the Contract with Daniel Moloney (S. Burke Testimony, p.258) and that the only Contract provision he discussed with Moloney was "the only provision I told him, the arbitration clause in the Contract for resolution of disputes" (S. Burke Testimony, p.257).

13.    Daniel Moloney testified that he was unable to carry on business while in the hospital (Moloney Testimony p. 124-125); never received the FedEx copy of the purported Contract, (Moloney Testimony, p.126) that he only had a vague recollection of Seamus Burke seeing him in the hospital (Moloney Testimony, p.127 and p.129); that he would not sign a Contract without his Attorney being present (Moloney Testimony p.128) and that he did nor remember signing the Contract (Moloney Testimony, p.130). See Transcript of Daniel Moloney Testimony - Exhibit "B"

See Transcript of Seamus Burke Testimony - Exhibit "C"

## THE PRIOR LITIGATION

14.    The AIA Contract provided for claims and disputes to be decided by arbitration before the American Arbitration Association.

15.    On or about March 2, 2005, the Petitioner "Shamrock", filed a Demand for Arbitration seeking damages of $650,000.00, plus interest, arbitration costs and Attorneys fees due to Respondents alleged "failure to pay for work, labor, services, material and equipment furnished in connection with the private improvement known as Manhattan Storage Project located on East 120th and 121st Street, New York, New York." This amount was reduced at trial to $396,545.56. See claim and demand for arbitration annexed as Exhibit "2" to the affidavit of Petitioner's Counsel, Joseph Asselta.

16.    Respondents Rose Realty Corp., Tempest Realty Corp., along with Liffey Van Lines, Inc. and Daniel Moloney filed a proceeding in the Supreme Court: New York County, Index # 103922/05 for an Order to Stay The Arbitration and for a determination as to which parties agreed to arbitrate.

17.     The aforementioned matter was referred to Special Referee, Louis Crespo, who determined that the only party subject to the terms of the AIA agreement was Respondent, Rose Realty Corp. See Respondent's Exhibit "A".

18.     The Hon. Kibbie Payne, Justice of the Supreme Court modified Special Referee, Louis Crespo's recommendation to require both Rose Realty Corp. and Tempest Realty Corp. to participate in the arbitration. See Judgment annexed as Exhibit "3" to the affidavit of petitioner's counsel, Joseph P. Assalta. Said decision did not require that both entities must be found to have joint liability.

19.     On August 3, 2006, Rose and Tempest filed counterclaims with the American Arbitration Association, as against Shamrock, which sought damages in excess of $150,000.00 plus interest, costs and attorneys feeds. (A copy of the counterclaim is annexed as Exhibit "4" to the affidavit of Joseph P. Asselta, Esq.)

20.     John A. Pappalardo, Esq., (hereinafter the "Arbitrator" was appointed to hear and determine the disputes between the petitioner Shamrock and respondents Rose and Tempest.

21.     With the consent of the Arbitrator, on January 25, 2007, Respondent's Rose and Tempest filed an Amended Counterclaim with the American Arbitration Association, as against Shamrock, which sought damages in excess of $150,000.00, a discharge of mechanics liens and a $100.00 per day penalty for failure to complete the work on time see amended counterclaim annexed as Exhibit "5" to the affidavit of petitioner's counsel, Joseph P. Asselta.

22.    On April 26, 2007, after several trial sessions, the Arbitrator made his Award in writing, a Copy of the Award is annexed as Exhibit "6" to the affidavit of Joseph P. Asselta, Esq.

23.    The Arbitrator's Award was not made in accordance with the terms and conditions of the Contract as well as the Construction Industry Rules of the American Arbitration Association and was contrary to the facts and evidence adduced at trial. The award should be vacated or modified as provided for in U.S.C.A. sections 10(a), 10(b) and 11(a).

## THE PETITIONER'S CLAIM FOR CHANGE ORDERS

24.    The AIA Contract, in Article 3.1 thereof, sets forth the contract sum as $3,285,000.00. The Contract provides in Article 12.1 that he owner "may order changes in the work within the general scope of the Contract consisting of additions, deletions or other revisions". However, it also provides that "such changes in the work shall be authorized by written change order signed by the owner, Contractor and architect, or by written change directive signed by owner and architect". See contract annexed Exhibit "1" to the affidavit of Joseph Asselta.

25.    Article 12 of the Contract is entitled "changes in the work". It specifically provides as follows:

> **12.1**    The Owner, without invalidating the Contract, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.  Such changes in the Work shall be authorized by written Change Order signed by the Owner,

Contractor and Architect, or by written Construction
Change Directive signed by the Owner and Architect.

**12.2**    The cost or credit to the Owner from a change in
the Work shall be determined by mutual agreement of the
parties or, in the case of a Construction Change Directive,
by the Contractor's cost of labor, material, equipment,
and reasonable overhead and profit.

**12.3**    The Architect will have authority to order minor
changes in the Work not involving adjustment in the
Contract Sum or extension of the Contract Time and not
inconsistent with the intent of the Contract Documents.
Such changes shall be effected by written order and shall
be binding on the Owner and Contractor. The Contractor
shall carry out such written orders promptly.

26.    Daniel Moloney, The Respondent's principal testified that he never

authorized any changes, never agreed to pay any costs for credits for changes in the work

and that the architect was not authorized to make other than the contractually provided

minor changes.

27.    Petitioner's principal, Seamus Burke testified that he was aware that

Change Orders must be in writing. He was asked the following questions:

> **Q:**    "Is there any requirement that Change Orders be
> in writing?"
> **A:**    "Yes"
>
> **Q:**    "What is your understanding of the Change Order
> requirements?"
> **A:**    "The Contract was supposed to be in writing"
>
> **Q:**    "Who are they supposed to be authorized by?"
> **A:**    "The owner or architect"
>
> **Q:**    "Look at 12.1, it is not a requirement that the
> Change Order be signed by the owner, by the architect
> and the contractor, three people."

**A:**    "Yes"

**Q:**    "How many written Change Orders did you offer to the owner of this project?"
**A:**    "One"
        (See S. Burke Testimony, p. 261) - Exhibit "C"

28.    The one purported Change Order (Respondent's hearing Exhibit "C-11") was a proposal dated October 25, 2004 to furnish and install partitions at 234 East 121st Street. Daniel Moloney testified that this was separate and distinct work and does not bear the legend "Change Order" as does ever other alleged Change Order for sub contractors as set forth as Petitioners exhibits. See hearing Exhibit "C-11"- annexed hereto as Exhibit "D".

29.    The Petitioners never once sent a written Change Order to Respondent's architect Jae Ko. (See S. Burke Testimony p. 264-265) - See Transcript - Exhibit "C".

30.    Seamus Burke further testified that other than hearing Exhibit "C-11" dated October 25, 2004, Shamrock never sent Daniel Moloney any Change Order. Seamus Burke however never testified as to any other type of paperwork being sent to Mr. Moloney. - See transcript - Exhibit "C".

31.    The Petitioner testified that he never once sent a Change Order to Respondent's architect, Jae Ko. (See S. Burke, p. 264) because Jae Ko stated "he had nothing to do with Change Orders" and he

"told me he didn't want them". (See S. Burke Testimony, p. 265 -
Exhibit "C")

      32.    Seamus Burke acknowledge that Jae Ko, the
architect could not bind the owner to expenses for major Changes Orders
stating that the architect "he could enter into minor changes" (See S.
Burke Testimony, p.296 - Exhibit "C")

      33.    Shamrock was totally responsible for expenses attributable to architect Jae
Ko's fees relating to permits, fees and re-designs.  These were directed by Shamrock
without any input by Daniel Moloney.

      34.    Petitioners Jay Morehouse testified that Shamrock, not Moloney, directed
Jae Ko to do the work relating to permits, fees or redesign.

      **Q:**    "Did Shamrock direct Jae Ko to perform any
work relating to permits, fees or redesign?"
      **A:**    "We did"
        (See Morehouse Testimony, p. 473-474)

      **Q:**    "Specifically what did you direct Mr. Jae Ko to
do as it violates to permit fees and redesign?"
      **A:**    "To redesign the building to match our Contract
documents"
      (See Morehouse Testimony, p. 476) - Transcript Exhibit

      "E"

      35.    Morehouse further testified that Shamrock unilaterally took over the
owner's responsibility to obtain permits and pay the fees.  (See Morehouse Testimony, p.
700-701).

      36.    Claimant's Jay Morehouse, the project director testified that no written
change was never offered to Rose Realty "because Seamus and Danny were friends".

(See Morehouse Testimony, p.685) He testified that based upon the assumption on his

part that they were friends that they didn't need a written Change Order. (See Morehouse

Testimony, p. 685-686)

37.    Jay Morehouse testified that he was concerned that the Contract required

written Change Orders, but that even with that concern, "I don't know that I did

anything". (See Morehouse Testimony, p.688-689)

> Mr. Morehouse was asked as follows:
>
> **Q:**    "On how many different occasions did Danny
> Moloney say in your presence, no changes, no extra
> fees?"
>
> **A:**    "I can't give you a number"
> (See Morehouse Testimony, p. 689)

38.    This witness had no knowledge of any pre-arbitration demand for payment

for Charge Order extras ever been sent to Moloney.  (See Morehouse Testimony, p.692)

39.    Seamus Burke acknowledged that on many occasions, in the presence of

witnesses, including subcontractor Pat Burke of LTB Mechanical, that Daniel Moloney

articulated that he did not want Contract changes that would change the Contract price.

40.    Seamus Burke was asked as follows:

> **Q:**    "How many times in your presence did Mr.
> Moloney say there will be nothing that will
> change the Contract price?"
>
> **A:**    "Probably four, five times."
> (See S. Burke Testimony, p. 301) - Exhibit "C"

41.    Seamus Burke tried to indicate that over dinners, Mr. Moloney would

consent to pay more money. Daniel Moloney denied this allegation, stating "No.

Seamus knew there was no additions." (See Moloney Testimony, p.136 - Exhibit "B")

42.    The Arbitrator questioned if Seamus Burke contacted Moloney about this

inconsistency:

> Mr. Pappilardo: The question is did you ever ask him the
> question during these meetings in the restaurant, did you
> ever say to him why are you adopting a position in these
> meetings no changes and I'm now telling you that there
> will be changes and you are authorizing them, did you
> ever ask him why he was doing that?
>
> The Witness:    No. You have to know Danny the way
> he does business, he is a negotiator, that's the way he
> does business (emphasis added)
>
> (See S. Burke Testimony p. 306-307) - Exhibit "C"

43.    Seamus Burke testified that he was not aware of any Contract provision

that allowed the architect to bind the owner for the $19,750.00 claimed as a Change

Order and that "Mr. Jae Ko never authorized the Change Orders. (See S. Burke

Testimony, p.319)

44.    Seamus Burke testified that he connected the building in question with the

building behind it, with Shamrock to supply the labor and Moloney to supply the

materials (See S. Burke Testimony, p.343)

45.    Even if true, and it is not true, that work would have not been within the

scope of work, nor would it therefore have been a change to the contracted work. That

travel from Atlanta , hotel lodging, automobile gas and meals are not provided for in

Contract Article 12.2 for Change Order costs, yet the Petitioner claimed payment for same.

46.    That expenses to obtain the Certificate of Occupancy were not part of the Respondent/Owner's contractual obligations as claimed by Seamus Burke (See S. Burke Testimony, p. 348)

47.    Daniel Moloney testified that the purpose of the construction was to build a warehouse with offices large enough to accommodate bug trucks. He stated "we put the building in the middle. We put parking lots at each end that you can drive the trailer in one side and out the other." (See Moloney Testimony, p. 132)

Moloney was also asked:

**Q:**    "Was it your intention to have that loading dock sufficiently large enough so you could get in and out these 75 Foot Trucks?"

**A:**    "That was the purpose of building the building in such a way we can unload and load inside."
            (See Moloney Testimony, p. 132) - Exhibit "B"

48.    That it would not have been necessary for any Change Order as the original plan was to accommodate these 75 foot trucks.

49.    Moloney testified that he never met the structural engineer, Mr Silverman and never gave him authority to make Contract changes, nor did he give architect, Jae Ko any authority to make changes (See Moloney Testimony, p. 133)

50.    Mr. Moloney further testified that he met with Seamus Burke and several contractors on several occasions and stated as follows:

"I told him there was a mortgage going on this building for "X" amount of money. This is the price that's guaranteed under any circumstances. There was no extra's unless I signed an extra for it. And I made it very, very clear including the electrician, plumbers, everybody including the air condition guy, everything, if there's a problem any place, should be brought to my attention."

(See Moloney Testimony, p. 134) - Exhibit "B"

51.    That the Petitioner failed to provide as a witness any sub-contractor to testify that the Respondent directed or required that sub-contractor to perform any change, or that the claimed work was actually done.

52.    That the Respondent called as a witness, Pat Burke, the H.V.A.C. subcontractor, L.T.B. Mechanical Corp. Mr. Burke specifically noted that he heard Daniel Moloney, on several occasions, state that no work changes were to be made and therefore he would pay no extra charges. He also testified that he never heard Daniel Moloney ever tell any sub-contractor to perform work changes. See Transcript - Exhibit "F"

53.    The electrical sub-contractor, Bill Moser of WAMCO Associates, Inc. testified that all re-do's or changes were directed by Shamrock employees (See Moser Testimony, February 1, 2007, p.18), were never directed by Daniel Moloney (Testimony p.19). He further testified that none of the Change Order additions charged to Respondents were directed by Mr. Moloney or anyone from the owners (Testimony p. 23-24). He specifically testified that the total sum paid ($30,500.00) for work order charges of $12,200.00, $8,700.00 and $9,800.00 was not directed by Moloney or anyone from the owners (See Testimony p.23-24). He testified that Shamrock's field

superintendent, Lonnie, directed the work (Testimony p. 29). Shamrock still owes WAMCO $19,941.00 of the $30,500.00 (See Testimony p.39). - Transcript -Exhibit "G"

54.     That the Petitioner's witness list included architect Jae Ko. He was not called to testify, presumably to state that Moloney not Shamrock directed changes to be made. The Petitioner had that burden or proof, not the Respondent.

55.     There should have been an adverse inference taken from the Petitioner's failure to call Jae Ko as a witness.

56.     The Contract between the parties clearly require Change Orders to be in writing signed by the contractor, owner and architect. The contractor never offered any written Change Orders to the owner.

57.     The Contractor never sent any request for payment, invoice or bill ro the owner prior to filing a demand for arbitration; Moloney paid all monies due (See Respondent Exhibit "H"). Daniel Maloney testified that he paid the full contract amount of $3,285,000.00 (See Moloney Testimony, February 1, 2007, p.166) - Exhibit "B"

58.     The Respondents were not liable for any alleged changed which may have been performed without the specific knowledge of the owner and without signed, acknowledged and unwritten Change Orders are required by the AIA Contract.

59.     As noted above, Daniel Moloney specifically denied that he orally issued any Change Orders.

60.     There were no written Change Orders; there were no changes authorized by a written change order signed by the owner, Contractor or architect as required by Article 12.1 of the Contract. Notwithstanding, and in violation of the clear terms and conditions of the AIA Contract, the Arbitration awarded $366,969.53 for alleged change

orders. See Award annexed as Exhibit "G" to the affidavit of petitioner's Counsel, Joseph
Assalta.

## THE SALES TAX CLAIM

61.     The Petitioner's request for additional monies for Sales Taxes was without
merit for several reasons. Notwithstanding the Arbitrator Awarded Petitioner $66,736.00
for Sales Taxes. See Award - Exhibit "1".

62.     Each subcontract offered in evidence by the Petitioner notes on its first
page the heading "scope of work". The language contained therein states "subcontractor
shall provide all labor, materials, equipment, hoisting, adequate supervision, taxes and
insurance necessary to perform all (type of work) as required by the Contract documents"
(emphasis added). (See as an example subcontract with Shannon Bros. Contracting, Ltd. -
Exhibit "I".

63.     The subcontract price therefore includes sales taxes, if applicable.

64.     The subcontractor's who testified in the case testified that they, and not
Shamrock, paid sales taxes, which were included in their sub-contract price.

65.     Pat Burke of L.T.B. Mechanical Corp. testified that he paid the sales taxes
in connection with the project (See Burke Testimony, February 1, 2007, p.9. See L.T.B.
Subcontract - Exhibit "F")

66.     In a like manner, Bill Moser, the principal of WAMCO, Incorporated, the
project electrical contractor stated that he paid the sales tax on the material he purchased,
adding "I've always incorporated the tax in the price of the job, because I won't want to
be hiring an accountant or whatever to collect this tax and everything else, creating
another problem for myself. So, so that is all the sales tax is included in the price of the

job". (See Moser Testimony, February 1, 2007, p.16 - Transcript - Exhibit "J". See also, WAMCO Subcontract, Exhibit "G".

67.     Richard Imprescia was called as Respondent's expert with respect with respect to Empire Zone programs. His curriculum vitae was introduced into evidence as Respondent's Exhibit "K".

68.     Mr. Imprescia works for Anchin, Block & Anchin, an accounting and consulting firm.  He was Regional Director for the Empire Zones program in New York City in the Governor Pataki administration from 1998 to 2003.

69.     He testified that the Respondent Rose Realty was certified with the Empire Zone program and thereby qualified to receive benefits including sales tax credits (See Imprescia Testimony, February 1, 2007 p. 62-63).  He noted that only the entity that is liable to pay the taxes is eligible to apply for a refund, and only that entity can apply for the refund for up to three years after completion of the project (See Testimony p.64). - Transcript - Exhibit "L"

70.     Mr. Imprescia indicated that there is a guide to sales and use tax incentives within the Empire Zone, these applied to Rose Realty Corp, Tempest Realty Corp. and Liffey Van Lines (See Testimony, p. 66). - Exhibit "L"

71.     Richard Imprescia testified that he met with Petitioner's Seamus Burke in November 2004 and advised Mr. Burke of the specific form (AU-11) that he had to submit to the State of New York to receive the Sales Tax refund (See Testimony p. 68. - See Exhibit "L" - See form AU-11- Respondent's Exhibit "M").  He provided Mr. Burke with a form AU-11 (See Testimony, p.69). - Exhibit "L"

72.    Mr. Imprescia also wrote to Seamus Burke. The letter summarized what they spoke about at the meeting (see Transcript, p. 70 and Letter - Exhibit "N").

73.    Richard Imprescia testified that he fully described to Seamus Burke what he could do with form AU-11 and that he could obtain a refund of the New York State portion of the sales tax (See Testimony, p.72-73). - Exhibit "L"

74.    He testified that certification was not even a requirement to obtain the sales tax refund (See Testimony, p.81). He noted, "I, for emphasis, reiterate that for this particular benefit, a company does not need to be certified, but they do have to be doing work on property in the Empire Zone" (See Testimony, p.89)

75.    He added in response to the Arbitrators questions that a Certificate of Eligibility was not even needed to qualify for the benefit.

> Arbitrator:        "Okay. You do not need the Certificate
> of Eligibility to qualify for that benefit?"
>
> Witness:        "Absolutely"
>            (See Testimony, p. 92) - Exhibit "L"

He further added in response to the Arbitrator:

> Arbitrator Pappalardo:"And I'm saying the same thing.
> Irrespective of whether you have a Certificate of
> Eligibility or not."
>
> Witness Imprescia:    "Right."
>            (See Testimony, p. 95) - Exhibit "L"

76.    Petitioner, Shamrock and Seamus Burke apparently failed to take advantage of the opportunity to get a refund of the sales tax they seek to recover from the Respondents. Since only Shamrock could apply for the refund, and Rose Realty and Tempest Realty Corp. could not, this liability should not be passed onto the Respondent.

Notwithstanding, the Arbitrate included the sum of $66,736.00 as part of his award to the Petitioner.

## THE RESPONDENT IS ENTITLED
## TO A CREDIT OF $143, 771.00

77.    The A.I.A. Contract between the parties states on Page 3 of Exhibit "B" that the "Heating, ventilation and air conditioning is included as an allowance of $120,00.00 (See Respondent's Exhibit "C-4". The Respondent entered into a subcontract with LTB Mechanical, Inc. for the HVAC work.  It provided for a subcontract price of $143,771.00 (See Respondent's Exhibit "O")

78.    Claimant's Seamus Burke testified that Shamrock paid no part of the monies due to LTB Mechanical, as noted in the trial transcript as follows:

Q:    "Mr. Burke, since you last testified two days ago, have you had an opportunity to check the records of LTB Mechanical with respect to the payment you received for the project at East 121st Street?"

A:    "Yes."

Q:    "And in checking, did you check to determine whether or not you had any payment whatsoever from the Claimant Shamrock Building?"

A:    "No, no payments from Shamrock."
(See S. Burke Testimony, February 1, 2007, p. 4) - Exhibit "C"

Claimant's Greg Barnes was similarly asked:

Q:    "On the lunch break, did you have a chance to call your office and see whether any payments were made to LTB with respect to the subcontract that we previously referred to?"

A:    "Yes, I did and no payments were made."
(See Transcript - Exhibit "P")

79.    Daniel Moloney testified that he spoke to Seamus Burke about getting an allowance of $120,000.00, "that's coming over (off) the price", but Moloney never got an invoice or document from Shamrock to confirm the $120,000.00 allowance (See Moloney Testimony, February 1, 2007, p.140). - See Exhibit "B"

80.    Pat Burke the principal of LTB Mechanical testified that the $143,771.00 subcontract was paid in full to him by Danny Moloney. He testified as follows:

> **Q:**    "All right. Did you determine whether or not you
> were paid in full for this project?"
>
> **A:**    "Yes, I am paid in full."
>
>
> **Q:**    "And can you tell me, did you check your records
> as to who paid you?"
>
> **A:**    "Yes."
>
> **Q:**    "And who did you determine paid you in full for
> your project?"
>
> **A:**    "Danny Moloney."
> (See Pat Burke Testimony, February 1, 2007, p.5) - Exhibit "F"

81.    The Respondent sought a credit of said $143,771.00 against any award to the Petitioner. The Arbitrator failed to make any mention of this credit claim in his award, notwithstanding this payment of said $143,771.00 by Respondent was not disputed at the arbitration proceedings.

## THE RESPONDENT IS LITIGATED DAMAGES
## DUE TO THE CLAIMANT'S FAILURE
## TO TIMELY COMPLETE THE WORK

82. Article 2.3 of the AIA Contract provides that the Contractor "shall achieve substantial completion of the entire work not later than 150 days from the date of commencement" and provides for liquidated damages of $100.00 per day for each date thereafter (See Contract - annexed as Exhibit "1" to the affidavit of Joseph Asselta.

83. Petitioner's Jay Morehouse stated the work commencement date was January 25, 2004 (See Morehouse Testimony, November 28, 2006, p.659). - Exhibit "E"

84. Petitioner's Seamus Burke conceded that Shamrock had 150 days to complete the work and that the deadline was not met.

> **Q:** "How much time did you have to complete the job?"
>
> **A:** "150 days."
>
> **Q:** "Did you complete the job within 150 days?"
>
> **A:** "No."
> (See S. Burke Testimony, November, 14, 2005, p.241-242) -

Exhibit "C"

85. Seamus Burke testified that the job was "completed in the latter part of '04" (see s. Burke Testimony, November 14, 2006, p.242). - Exhibit "C"

86. Seamus Burke added that, "beginning of November I think that job was probably what you would call substantially completed" (See S. Burke Testimony, November 14, 2006, p. 244). - Exhibit "C"

87. Paragraph 14.5.1 of the A.I.A. Contract requires the contractor to send out written notice that the work was ready for final inspection (See Contract - Exhibit "1")

88. Seamus Burke testified "we didn't send notification to Mr. Moloney" (See S. Burke Testimony, November 14, 2006, p. 244). - Exhibit "C"

89.    Paragraph 14.5.2. of the A.I.A. Contract states that "final payment shall not become due until the contractor has delivered to the owner a complete release of all liens arising out of this Contract or receipts in full covering all labor, materials and equipment for which a lien could be filed, or a bond satisfactory to the owner to indemnify the owner against such lien" (See Contract, Respondent's Exhibit "1").

90.    Seamus Burke testified that he neither provided a complete release of all liens nor a bond satisfactory to the owner  (See S. Burke Testimony, November 14, 2006, p. 245-246).

91.    Seamus Burke was asked:

> Q:    "Pursuant to the Contract, 14.5.2 is it not correct
> that final payment is still not due at this point?"
>
> A:    "Terms of the Contract, yes."
>
> Q:    "So the final payment is not even due as of today,
> is that correct?"
>
> A:    "If we're - per the terms of the Contract, yes."
> (See S. Burke Testimony, November 14, 2006, p.247) - Exhibit

"C"

92.    The Respondents amended counterclaim sought the sum of $100.00 per day due to the Petitioner's failure to complete the work on time. The Arbitrator's award made absolutely no reference to the work not being timely completed, notwithstanding Petitioner's testimony admitting it did not complete the work in 150 days. The Arbitrator's award failed to make any reference to this claim which was believed to be valued up to $78,600.00.


**The Counterclaim With Respect To Incomplete Work and Mechanics Liens**

93.    The Respondent's testified that the Petitioner had been paid in full for the amount due under the Contract and that no additional monies are due and owing. The Respondent's Amended Counterclaim alleges that the Claimant had not completed its work as set forth in the Contract failed to install doors adjoining the basement; failed to complete electrical work, including hook-up fans and generators; failed to join all floors to the adjacent building, all of which cause damages of $150,000.00; that the Claimant failed to pay subcontractors resulting in liens on the premises to CSC of NY, Inc. ($4,000.00), Dember Construction ($30,265.30); Capital Fire Sprinkler Co. ($14,612.31); Tailored Roofing ($6,844.40) for a total of unpaid Mechanical Liens of $55,722.01. The Petitioner did not dispute the existence of any of said mechanics lien, nor did they dispute that their subcontractor, Capital Fire Sprinkler Co. has a lawsuit pending against both Petitioner and Respondent for unpaid work, labor and services.

94.    Notwithstanding, The Arbitrator's award made no mention of Respondent's Counterclaim for incomplete work and/repairs.

## The Contract Did Not Provide For Counsel Fees

94.    The AIA Contract, Article 9.10 provided for Arbitration of claims and disputes. The Contract does not have any provision for an award of counsel fees to any party for any reason.

95.    Without any contractual or statutory grounds for an award of counsel fees, it was improper for the Arbitrator to award the Petitioner counsel fees in the sum of $59,992.29.

## **The Total Failure Of Proof As To Respondent Tempest Realty Corp.**

96.    Not one word of testimony at the Arbitration proceedings indicated that

Tempest Realty Corp. had any relationship whatsoever with the Petitioner with respect to

its claim.

97.    The AIA Contract dated "25th day of September, 2003" fails to set forth

the name of the project owner. As a consequence of judicial intervention, the

Respondent's that were required to proceed arbitration were Rose Realty Corp. and

Tempest Realty Corp.

98.    None of the Petitioner's witnesses testified as to any participation by

Tempest Realty Corp. No payments were made by Tempest Realty Corp.. Most of the

Petitioner's witnesses testified that they never even heard of the name, Tempest Realty

Corp.

99.    Tempest Realty Corp. owns certain certain parcels of land upon which the

Claimant performed work. These parcels were leased to Rose Realty Corp. for ninety-

nine (99) years pursuant to a lease dated August 1, 2001. Article "Eighth" of said lease

requires Rose Realty Corp. to indemnify and save Tempest Realty Corp. harmless from

all claims and causes for action. See Lease - Exhibit "Q"

100.    Daniel Moloney testified that Tempest Realty Corp. played no role in the

construction project (Moloney Testimony p.119); that Rose Realty Corp. leased the

property from Tempest and paid no monies to Shamrock (Moloney Testimony p.120).

See Transcript of Moloney Testimony - Exhibit "B".

101.    Seamus Burke the Director of operations of Shamrock (S. Burke Testimony, p.146) testified that the did not know if Tempest knowingly entered into the agreement to submit to arbitration (S. Burke Testimony p. 286); that there was no mention of the words Tempest Realty Corp. during the course of doing the job (S. Burke Testimony, p. 287) and that the first time that he had heard of Tempest Realty Corp. was at the end of the job (S. Burke Testimony, p.288). See Transcript of Seamus Burke Testimony - Exhibit "C".

102.    Inexplicably, the Award of the Arbitration fails to make any reference to the Respondent's assertion that Tempest Realty Corp. had no contractual or other relationship with the Petitioner.

103.    The Arbitrator's Award without explanation found that the "Respondent's are jointly responsible". There was absolutely no testimony elicted at the hearing, which would support any finding of liability against Respondent Tempest Realty Corp.

104.    The Award of the Arbitration should be vacated pursuant to 9 U.S.C.A. section 10(a) as there was evident partiality by the Arbitrator and because the Arbitrator imperfectly executed his powers.

105.    The award should be vacated and pursuant to 9 U.S.C.A. section 10(b), the court should direct a rehearing by the Arbitrator.

106.    The Award of the Arbitrator should be vacated pursuant to 9 U.S.C.A. section 11(a), as there was an evident material miscalculation of figures and an evident mistake in the description of the persons to be referred to in the award; and the Court can modify and correct the award to promote justice between the parties.

107.    This application is made within one year after the aforesaid delivery of the

Award.

108.    No prior application has been made for the relief requested herein.


WHEREFORE, Respondent's Rose Realty Corp. and Tempest Realty Corp.

respectfully pray for an order modifying or vacating the Award of the Arbitrator dated

April 26, 2007; vacating the award in its entirety as to Respondent, Tempest Realty

Corp., or in the alternative for an order directing a rehearing before the Arbitrator, and for

such other and further relief as the Court deems just and proper.


Dated: New York, New York

    May  30    , 2007


                                        Yours, etc.

                                        AGULNICK & GOGEL, LLC
                                        Attorneys for Respondents
                                        321 Broadway, 2nd Floor
                                        New York, New York 10007
                                        (212) 233-9500

                                        By_____
                                            William A. Gogel (WG-3271)


Sworn to before me
This  30TH day of May, 2007.

PETER AGULNICK
Notary Public - State of New York
NO. 02AG6071809
Qualified in New York County
My Commission Expires Mar 25, 2000

Index No. _____ Year _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAMROCK BUILDING SYSTEMS, INC.,

Petitioner,

-against-

ROSE REALTY CORP. and TEMPEST
REALTY CORP.,

Respondents.

AFFIRMATION IN SUPPORT OF CROSS PETITION
TO MODIFY OR VACATE ARBITRATION AWARD

Signature (Rule 130-1.1-a)

Print name beneath     William A. Gogel

Attorneys for

**AGULNICK & GOGEL, LLC**

*Office and Post Office Address, Telephone*
321 BROADWAY, 2ND FLOOR
NEW YORK, N.Y. 10007
212-233-9500
FAX (212) 693-1666

To

Attorney(s) for

Service of a copy of the within is hereby admitted.
Dated,

.................................................

Attorney(s) for

---

NOTICE OF ENTRY

PLEASE take notice that the within is a (certified) true copy of a duly entered in the office of the clerk of the within named court on

Dated,

Yours, etc.

**AGULNICK & GOGEL, LLC**

*Office and Post Office Address*
321 BROADWAY, 2ND FLOOR
NEW YORK, N.Y. 10007

Attorney(s) for

NOTICE OF SETTLEMENT

PLEASE take notice that an order of which the within is a true copy will be presented for settlement to the Hon. one of the judges of the within named Court, at

on

at               M.

Dated,

Yours, etc.

**AGULNICK & GOGEL, LLC**

*Office and Post Office Address*
321 BROADWAY, 2ND FLOOR
NEW YORK, N.Y. 10007

Attorneys for

To

Attorney(s) for