**Exhibit 11**

AMERICAN ARBITRATION ASSOCIATION

————————————————————————— X

SHAMROCK BUILDING SYSTEMS, INC.,

**Case NO. 13 110Y00622 05**

Claimant,

- against -

ROSE REALTY CORP., and TEMPEST
REALTY CORP.,

Respondents.

————————————————————————— X

## RESPONDENT'S POST-ARBITRATION BRIEF

AGULNICK & GOGEL, LLC
*Attorneys for Respondent*
321 Broadway - 2nd Floor
New York, New York 10007
(212) 233-9500

AMERICAN ARBITRATION ASSOCIATION
_____ X

SHAMROCK BUILDING SYSTEMS, INC.,

         **Case NO. 13 110Y00622 05**

       Claimant,

  - against -

ROSE REALTY CORP., and TEMPEST
REALTY CORP.,

        Respondents.

_____ X

## RESPONDENT'S POST-ARBITRATION BRIEF

**AGULNICK & GOGEL, LLC**
*Attorneys for Respondent*
321 Broadway - 2nd Floor
New York, New York 10007
(212) 233-9500

## THE CLAIM AND COUNTERCLAIM

The Claimant, Shamrock Building Systems, hereinafter referred to as "Shamrock", filed a Demand for Arbitration seeking damages of $650,000.00, plus interest, arbitration costs and Attorneys fees due to Respondents alleged "failure to pay for work, labor, services, material and equipment furnished in connection with the private improvement known as Manhattan Storage Project located on East 120th and 121st Street, New York, NY." This amount was reduced at trial to $398,472.56 see Owner Change Order Log - Hearing Exhibit "C-18" and further reduced by virtue of a reduction of claimed amount on Item 25 thereof to $396,545.56.

The Claimant's Demand for Arbitration never asserted a claim for unpaid sales taxes. No Amended Demand for Arbitration was ever filed by the Claimant to assert a claim for unpaid sales taxes.

The A.I.A. Contract (Claimant Exhibit "C-4", Respondent's Exhibit "A") in Article 3.1 set forth the Contract sum as $3,285,000.00.

The Contract provides in Article 12.1 that the owner "may order changes in the work within the general scope of the Contract consisting of additions, deletions or other revisions." However, it also provides that "such changes in the work shall be authorized by written change order signed by the owner, Contractor and architect, or by written change directive signed by owner and architect."

The Respondent has alleged that it has paid in full all sums of money due pursuant to the terms of the Contract and that no Change Orders were signed or approved that should result in additional monies being due. In fact, the testimony adduced at trial, by both Claimant's and Respondent's witnesses was that the owner's principal, Daniel

2

Moloney repeatedly indicated that he would not allow any changes nor would he pay for any changes.

There were no written Change Orders; there were no changes authorized by a written change order signed by the owner, Contractor or architect as required by Article 12.1 of the Contract.

The Respondent's position is that the Claimant has been paid in full for the amount due under the Contract and that no additional monies are due and owing. The Respondent's Amended Counterclaim alleges that the Claimant had not completed its work as set forth in the Contract; failed and neglected to repair water leaks; failed to replace defective doors; failed to install doors adjoining the basement; failed to complete electrical work, including hook-up fans and generators; failed to join all floors to the adjacent building, all of which cause damages of $150,000.00; that the Claimant failed to pay subcontractors resulting in liens on the premises to CSC of NY, Inc. ( $4,000.00), Dember Construction ($30,265.30); Capital Fire Sprinkler Co. ($14,612.31); Tailored Roofing ($6,844.40) for a total of unpaid Mechanical Liens of $55,722.01 (See Respondent's Exhibit "I").

In addition, the failure of Claimant to pay Capital Fire Sprinkler Co., Inc. has required the Respondent to hire an Attorney and defend the lawsuit brought by Capitol Fire Sprinkler Co. against both the Claimant and Respondent.  That matter is trial ready as a Notice of Trial has been filed (See Complaint - Respondent's Exhibit "M").

Further the amended counterclaim seeks the sum of $100.00 per day from the Claimant for failure to complete the work on time.  The Contract provides in Article 2.3 that the Contractor shall achieve substantial completion of the entire work no later than

150 days from the date of commencement, with liquidated damages that "shall not exceed $100.00 per day."

The Respondent seeks litigated damages of between $14,100.00 to $78,600.00 for failure to complete the work within 150 days. The Respondent directly paid subcontractor, LTB Mechanical Corp. the entire $143,771.00 due (See Respondent's Exhibit "N" and seeks a credit $143,771.00, the allowance as provided for in the Contract).

## TEMPEST REALTY CORP. AS A PARTY TO THE AGREEMENT TO ARBITRATE

The AIA Contracted dated "25th day of September, 2003" fails set forth the name of the project owner. As a consequence of judicial intervention, the Respondent's that were required to proceed arbitration were Rose Realty Corp. and Tempest Realty Corp.

None of the Claimant's witnesses testified as to any participation by Tempest Realty Corp. No payments were made by Tempest Realty Corp. Most of Claimants' witnesses testified that they never even heard of the name, Tempest Realty Corp.

Tempest Realty Corp. owns certain of the parcels of land upon which the Claimant performed work. These parcels were leased to Rose Realty Corp. for ninety-nine (99) years pursuant to a lease dated August 1, 2001. Article "Eighth" of said lease requires Rose Realty Corp. to indemnify and save Tempest Realty Corp. harmless from all claims and causes of action. See Respondent's Exhibit "J".

Daniel Moloney testified that Tempest Realty Corp. played no role in the construction project (Moloney Testimony p.119); that Rose Realty Corp. leased the property from Tempest and paid no monies to Shamrock (Moloney Testimony p.120).

4

Seamus Burke, the Director of operations of Shamrock (S. Burke Testimony, p.146) testified that he did not know if Tempest knowingly entered into the agreement to submit to arbitration (S. Burke Testimony, p.286); that there was no mention of the words Tempest Realty during the course of doing the job (S. Burke Testimony, p.287) and that the first time that he heard of the name Tempest Realty Corp. was at the end of the job (S. Burke Testimony, p.288).

## THE EXECUTION OF THE CONTRACT

The A.I.A Contract was signed by Daniel Moloney while he was hospitalized in Columbia Presbyterian Hospital from the complications of open heart surgery; while he was on heavy sedative medication; while he was barely conscious and when he was alone with Shamrock's, Seamus Burke.

Seamus Burke testified that the contract was signed by Daniel Moloney "in the hospital"; that he was in the hospital because "he had some heart surgery" and stated "I was aware he was seriously ill" (S. Burke testimony p.252). Burke claimed that the Contract was sent to Daniel Moloney's office some three (3) weeks earlier and not sent to the hospital (S. Burke Testimony, p. 253 and 256). Seamus Burke testified that he did not ask any nurse or doctor whether Moloney had the capability of reading and understanding a Contract (S.Burke testimony, p.256)

Seamus Burke testified that he discussed the Contract with Moloney for a "few minutes, two, three minutes" (S. Burke Testimony, p.258); that he did not discuss the change order provision of the Contract with Daniel Moloney (S. Burke Testimony, p.258) and that the only Contract provision he discussed with Moloney was "the only provision I

told him, the arbitration clause in the Contract for resolution of disputes" (S. Burke Testimony, p.257)

Daniel Moloney testified that he was unable to carry on business while in the hospital (Moloney Testimony p. 124-125); never received the FedEx copy of the Contract (Moloney Testimony, p.126) that he only had a vague recollection of Seamus Burke seeing him in the hospital (Moloney Testimony p. 127 and p.129); that he would not sign a Contract without his Attorney being present (Moloney Testimony p.128) and that he did not remember signing the Contract (Moloney Testimony, p.130).

In this same reprehensible manner of entering into a Contract to construct the building at 234 East 12th Street, Shamrock conducted its business with Rose Realty Corp.

Shamrock ignored all Contract provisions to the detriment of the Respondent.

### THE CLAIM FOR CHANGE ORDERS

Article 12 of the Contract is entitled "changes in the work." See Claimant's Exhibit "C-4", respondent's Exhibit "A". Article 12 specifically provides as follows:

> **12.1**  The Owner, without invalidating the Contract, may order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly. Such changes in the Work shall be authorized by written Change Order signed by the Owner, Contractor and Architect, or by written Construction Change Directive signed by the Owner and Architect.

> **12.2**  The cost or credit to the Owner from a change in the Work shall be determined by mutual agreement of the

parties or, in the case of a Construction Change Directive, by the Contractor's cost of labor, material, equipment, and reasonable overhead and profit.

**12.3**    The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall be effected by written order and shall be binding on the Owner and Contractor.  The Contractor shall carry out such written orders promptly.

It is the Respondent's position that it never was requested to sign a change order; never authorized any changes, never agreed to pay any costs for credits for changes in the work and that the architect was not authorized to make other than the contractually provided minor changes.

Seamus Burke testified that he was aware that Change Orders must be in writing. He was asked the following questions:

> Q:      "Is there any requirement that Change Orders be in writing?"
> A:      "Yes"

> Q:      "What is your understanding of the Change Order requirements?"
> A:      "The Contract was supposed to be in writing"

> Q:      "Who are they supposed to be authorized by?"
> A:      "The owner or architect"

> Q:      "Look at 12.1, it is not a requirement that the Change Order be signed by the owner, by the architect and the contractor, three people."
> A:      "Yes"

> Q:      "How many written Change Orders did you offer to the owner of this project?"
> A:      "One"
>            (See S. Burke Testimony, p. 261)

The one purported Change Order (Respondent's Exhibit "C-11") was a proposal dated October 25, 2004 to furnish and install partitions at 234 E 121st Street. Daniel Moloney testified that this was separate and distinct work and does not bear the legend "Change Order" as does every other alleged Change Order included with Claimant's exhibits.

Daniel Moloney specifically testified that the agreement to furnish and install partitions, Claimant's Exhibit "C-11" was not part of the original deal and it was not a Change Order. See Moloney Testimony, February 1, 2007, page 142. Daniel Moloney testified that he never received any Change Order. (See Moloney Testimony, February 1, 2007 p. 145.)

The Claimant's never once sent a written Change Order to Respondent's architect Jae Ko. (See S. Burke Testimony p. 264-265)

Seamus Burke further testified that other than Exhibit "C-11" dated October 25, 2004, Shamrock never sent Daniel Moloney any Change Order. (see S. Burke Testimony p.263) because "Mr. Moloney refused to deal with any paperwork I sent him." (see S. Burke Testimony p. 263) Seamus Burke however never testified as to any other type of paperwork being sent to Mr. Moloney.

The Claimant testified that he never once sent a Change Order to Respondent's architect, Jae Ko. (See S. Burke, p. 264) because Jae Ko stated "he had nothing to do with Change Orders" and he "told me he didn't want them". (See S. Burke Testimony, p.265)

Seamus Burke acknowledge that Jae Ko, the architect could not bind the owner to expenses major Changes Orders stating that the architect "he could enter into minor changes" (See S. Burke Testimony, p.296)

Shamrock was totally responsible for expenses attributable to architect Jae Ko's fees relating to permits, fees and re-designs. These were directed by Shamrock without any input by Daniel Moloney.

Claimant's Jay Morehouse testified that Shamrock, not Moloney, directed Jae Ko to do the work relating to permits, fees or redesign.

> Q:    "Did Shamrock direct Jae Ko to perform any work relating to permits, fees or redesign?"
> A:    "We did"
>       (See Morehouse Testimony, p. 473-474)

> Q:    "Specifically what did you direct Mr. Jae Ko to do as it violates to permit fees and redesign?"
> A:    "To redesign the building to match our Contract documents"
>       (See Morehouse Testimony, p. 476)

He testified that Shamrock unilaterally took over the owner's responsibility to obtain permits and pay the fees. (See Morehouse Testimony, p. 700-701).

Claimant's Jay Morehouse, the project director testified that no written change was never offered to Rose Realty "because Seamus and Danny were friends. (See Morehouse Testimony, p.685) He testified that based upon the assumption on his part that they were friends that they didn't need a written Change Order. (See Morehouse Testimony, p. 685-686)

Jay Morehouse testified that he was concerned that the Contract required written Change Orders, but that even with that concern "I don't know that I did anything." (See Morehouse Testimony, p.688-689)

Mr. Morehouse was asked as follow:

> Q:    "On how many different occasions did Danny Moloney say in your presence, no changes, no extra fees?"

9

A:      "I can't give you a number"
(See Morehouse Testimony, p. 689)

This witness had no knowledge of any pre-arbitration demand for payment for

Charge Order extras ever been sent to Moloney.  (See Morehouse Testimony, p.692)

Seamus Burke acknowledged that in many occasions, in the presence of

witnesses, including Pat Burke of LTB Mechanical, that Daniel Moloney articulated that

he did not want Contract changes that would change the Contract price.

Seamus Burke was asked as follows:

Q:      "How many times n your presence did Mr.
Moloney say there will be nothing that will
change the Contract price?"
A:      "Probably four, five times."
(See S. Burke Testimony, p. 301)


Seamus Burke tried to indicate that over dinners, Mr. Moloney would consent to

pay more money.  Daniel Moloney denied this allegation, stating "No.  Seamus knew

there was no additions." (See Moloney Testimony, p.136)

The Arbitration questioned if Seamus Burke contacted Moloney about this

inconsistency:

Mr. Pappilardo:  The question is did you ever ask him the
question during these meetings in the restaurant, did you
ever say to him why are you adopting a position in these
meetings no changes and I'm now telling you that there
will be changes and you are authorizing them, did you
ever ask him why he was doing that?

The Witness:    No.  You have to know Danny the way
he does business, he is a negotiator, that's the way he
does business (emphasis added)

(See S. Burke Testimony p. 306-307)

Seamus Burke testified that he was not aware of any Contract provision that allowed the architect to bind the owner for the $19,750.00 claimed as a Change Order in Claimant's Exhibit "C-11", and that "Mr. Jae Ko never authorized the Change Orders. (See S. Burke Testimony, p.319)

Seamus Burke testified that he connected the building in question with the building behind it, with Shamrock to supply the labor and Moloney to supply the materials (See S. Burke Testimony, p.343)

Even if true, and it is not true, that work would have not been within the scope of work, nor would it therefore have been a change to the contracted work. That travel from Atlanta , hotel lodging, automobile gas and meals are not provided for in Contract Article 12.2 for Change Order costs.

That expenses to obtain the Certificate of Occupancy were not part of the Respondent/Owner's contractual obligations as claimed by Seamus Burke (See S. Burke Testimony, p. 348)

That Daniel Moloney testified that the purpose of the construction was to build a warehouse with offices large enough to accommodate bug trucks. He stated "we put the building in the middle. We put parking lots at each end that you can drive the trailer in one side and out the other." (See Moloney Testimony, p. 132)

> Moloney was also asked:
> **Q:**    "Was it your intention to have that loading dock sufficiently large enough so you could get in and out these 75 Foot Trucks?"
>
> **A:**    "That was the purpose of building the building in such a way we can unload and load inside."
> (See Moloney Testimony, p. 132)

11

That it would not have been necessary for any Change Order as the original plan was to accommodate these 75 foot trucks.

Moloney testified that he never met the structural engineer, Mr Silverman and never gave him authority to make Contract changes, nor did he give architect, Jae Ko any authority to make changes (See Moloney Testimony, p. 133)

Mr. Moloney further testified that he met with Seamus Burke and several contractors on several occasions and stated as follows:

> "I told him there was a mortgage going on this building for "X" amount of money. This is the price that's guaranteed under any circumstances. There was no extra's unless I signed an extra for it. And I made it very, very clear including the electrician, plumbers, everybody including the air condition guy, everything, if there's a problem any place, should be brought to my attention."

(See Moloney Testimony, p. 134)

Moloney testified that Mike Neville and Dave Ross were employees of Liffey Van Lines, Inc., and had nothing to do with Rose Realty Corp. nor Tempest Realty Corp. and had no authority to make changes. (See Moloney Testimony, p. 137-138)

Mike Neville, as an employee of Liffey Van Lines, Inc. testified that he works in the building at 234 East 121st Street, New York, New York. Part of his testimony, together with photographs that he took, conclusively prove that some of the claimed Change Orders are complete fabrications. The photograph show none of the alleged holes placed in Liberty's steel beams so that sprinkler lines could be above the ceiling. (See Photograph's Exhibit Q1 to Q9, nor were the bathrooms accommodate Daniel Moloney's office reconfiguration. See Photos Exhibits "R-1", "R-2", "R-3".)

That the Claimant failed to provide as a witness any sub-contractor to testify that the Respondent directed or required that sub-contractor to perform any change, or that the claimed work was actually done.

That the Respondent called as a witness the H.V.A.C. subcontractor, L.T.B. Mechanical Corp. Its principal specifically noted that he heard Daniel Moloney, on several occasions, state that no work changes were to be made and therefore he would pay no extra charges. He also testified that he never heard Daniel Moloney ever tell any sub-contractor to perform work changes.

The electrical sub-contractor, Bill Moser of WAMCO Associates, Inc. testified that all re-do's or changes were directed by Shamrock employees (See Moser Testimony, February 1, 2007, p.18), were never directed by Daniel Moloney (Testimony p.19). He further testified that none of the Change Order additions refereed to as items 8,9 and 10 on Claimants Exhibit "C-18" were directed by Mr. Moloney or anyone from the owners (Testimony p. 23-24). He specifically testified that the total sum paid ($30,500.00) for work order charges of $12,200.00, $8,700.00 and $9,800.00 was not directed by Moloney or anyone from the owners (See Testimony p.23-24). He testified that Shamrock's field superintendent, Lonnie, directed the work (Testimony p. 29). Shamrock still owes WAMCO $19,941.00 of the $30,500.00 (See Testimony p.39).

That the Claimant's witness list included architect Jae Ko. He was not called to testify, presumably to state that Moloney not Shamrock directed changes to be made. The Claimant had that burden or proof, not the Respondent.

There must be an adverse inference taken from the Claimant's failure to call Jae Ko as a witness.

The Contract between the parties clearly require Change Orders to be in writing signed by the contractor, owner and architect. The contractor never offered any Change Orders to the owner.

The Contractor never sent any request for payment, invoice or bill to the owner prior to filing a demand for arbitration; Moloney paid all monies due (See Respondent Exhibition "K"). Daniel Moloney testified that he paid the full contract amount of $3,285,000.00 (See Moloney Testimony, February 1, 2007, p.166).

The Respondent is not liable for any alleged changes which may have been performed without the specific knowledge of the owner and without signed, acknowledged and unwritten Change Orders are required by the A.I.A. Contract.

As noted above, Daniel Moloney specifically denied that he orally issued any Change Orders.

Having failed to secure a written order for claimed work charges and extras, New York Courts have barred for any claimed recovery by contractors. Albert Saggese, Inc. v. Town of Hempstead; 100 AD2d885,474NYS2d542

The Courts have determined that the ultimate guide in determining whether or not the contractor is to be paid for the extra work is the paid for the extra work is the Contract itself. Kuhs v. Flower City Tissue Mills, Co., 104 MISC243,189APPDIV539, Aff'd 231NY637.

Whereas same counts have allowed oral directions to modify a Contract provision requiring written authorization, see Barsutti, Inc. v. Consolidated Edison of New York, 254AD2d211, that case is not applicable as Daniel Moloney and other witnesses testified

that no such oral directive existed. In fact, even Seamus Burke acknowledged that Danny Moloney testified that he would not allow any extra work that cost any additional monies.

The Courts "have held that the purpose of compelling the contractor to furnish written notice and to prevent oral modification---is to obviate any issue go to the credibility of either the contractor or the [Agent] as to what was or was not said by either of them" Huff Enterprises, Inc. v. Triborough Bridge and Tunnel Authority, 191AD2d314,595NYS2d178.

In the absence of finding that a Contract was breached between the owner and general contractor, the general contractor may not recover in quantum meruit. Larose v. Backer, 11AD2d314, 203NYS2d740. Recovery in quantum meruit is available only if the Contract shows that the Contract was repudiated or waived by the other party. Abinet v. Mediavilla, 5 AD2d679. See also Hickman v. Leary, 255AppDiv733. For these reasons, quantum meruit as a basis on award to the Claimant would be improper.

In the case at bar, the conduct of the owner, and his specific statements confirm that it did not waive the written Change Order requirement and did not modify the Contract to allow oral approval of extra work.

For these reasons, the Claimant is not entitled to an award for alleged Change Orders.


## THE SALES TAX CLAIM

The Contractor/Claimant's request for additional monies for Sales Taxes is without merit for several reasons.

Each subcontract offered in evidence by the Claimant notes on its first page the heading "scope of work." The language contained therein states "subcontractor shall provide all labor, materials, equipment, hoisting, adequate supervision, <u>taxes</u> and insurance necessary to perform all (type of work) as required by the Contract documents" (emphasis added). (See as an example subcontract with Shannon Bros. Contracting, Ltd. - Exhibit "C-50")

The subcontract price therefore includes sales taxes, if applicable.

The subcontractor's who testified in the case testified that they paid sales taxes which were included in their sub-contract price.

Pat Burke of L.T.B. Mechanical Corp. testified that he paid the sales taxes in connection with the project (See Burke Testimony, February 1, 2007, p.9. See L.T.B. Subcontract - Exhibit "C-10")

In a like manner, Bill Moser, the principal of WAMCO, Incorporated, the project electrical contractor stated that he paid the sales tax on the material he purchased, adding "I've always incorporated the tax in the price of the job, because I don't want to be hiring an accountant or whatever to collect this tax and everything else, creating another problem for myself. So, so that is all the sales tax is included in the price of the job." (See Moser Testimony, February 1, 2007, p.16. See also, WAMCO Subcontract, Exhibit "C-34")

Richard Imprescia was called as Respondent's expert with respect to Empire Zone programs. His curriculum vitae was introduced into evidence as Respondent's Exhibit "T".

16

Mr. Imprescia works for Anchin, Block & Anchin, an accounting and consulting firm. He was Regional Director for the Empire Zones program in New York City in the Governor Pataki administration from 1998 to 2003.

He testified that the Respondent Rose Realty was certified with the Empire Zone program and thereby qualified to receive benefits including sales tax credits (See Imprescia Testimony, February 1, 2007 p. 62-63). He noted that only the entity that is liable to pay the taxes is eligible to apply for a refund, and can apply for the refund for up to three years after completion of the project (See Testimony p.64).

Mr. Imprescia indicated that there is a guide to sales and use tax incentives within the Empire Zone that applied (See Respondent's Exhibit "U") it to Rose Realty Corp, Tempest Realty Corp. and Liffey Van Lines (See Testimony, p. 66).

Richard Imprescia testified that he met with Claimant's Seamus Burke in November 2004 and advised Mr. Burke of the specific form (AU-11) that he had to submit to the State of New York to receive the refund (See Testimony p. 68. See form AU-11- Respondent's Exhibit "V"). He provided Mr. Burke with a form Au-11 (See Testimony, p.69).

Mr. Imprescia also wrote to Seamus Burke. The letter summarized what they spoke about at the meeting (see Transcript, p. 70 and Letter - Exhibit "X").

Richard Imprescia testified that he fully described to Seamus Burke what he could do with form AU-11 and that he could obtain a refund of the New York State portion of the sales tax (See Testimony, p.72-73).

He testified that certification was not even a requirement to obtain the sales tax refund (See Testimony, p.81). He noted "I, for emphasis, reiterate that for this particular

benefit, a company does not need to be certified, but they do have to be doing work on property in the Empire Zone" (See Testimony, p.89)

He added in response to the Arbitrators questions that a Certificate of Eligibility was not even weeded to qualify for the benefit.

> Arbitrator:        "Okay. You do not need the Certificate
> of Eligibility to qualify for that benefit?"

> Witness:        "Absolutely"
>             (See Testimony, p. 92)

He further added in response to the Arbitrator:

> Arbitrator Pappalardo:"And I'm saying the same thing.
> Irrespective of whether you have a Certificate of
> Eligibility or not."

> Witness Imprescia:    "Right."
>             (See Testimony, p. 95)

Shamrock and Seamus Burke apparently failed to take advantage of the opportunity to get a refund of the sales tax they seek to recover from the Respondents. Since only Shamrock could apply for the refund, and Rose Realty could not, this liability should not be passed onto the Respondent.

### THE RESPONDENT IS ENTITLED
### TO A CREDIT OF $143, 771.00

The A.I.A. Contract between the parties states on Page 3 of Exhibit "B" that the "Heating, ventilation and air conditioning is included as an allowance of $120,00.00 (See Respondent's Exhibit "C-4". The Respondent entered into a subcontract with LTB Mechanical, Inc. for the HVAC work. It provided for a subcontract price of $143,771.00 (See Respondent's Exhibit "C-10").

Claimant's Seamus Burke testified that Shamrock paid no part of the monies due to LTB Mechanical, as noted in the trial transcript as follows:

> Q:    "Mr. Burke, since you last testified two days ago, have you had an opportunity to check the records of LTB Mechanical with respect to the payment you received for the project at East 121st Street?"
>
> A:    "Yes."
>
> Q:    "And in checking, did you check to determine whether or not you had any payment whatsoever from the Claimant Shamrock Building?"
>
> A:    "No, no payments from Shamrock."
>        (See S. Burke Testimony, February 1, 2007, p. 4)

Claimant's Grey Barnes was similar asked:

> Q:    "On the lunch break, did you have a chance to call your office and see whether any payments were made to LTB with respect to the subcontract that we previously referred to?"
>
> A:    "Yes, I did and no payments were made."

Daniel Moloney testified that he spoke to Seamus Burke about getting an allowance of $120,000.00, "that's coming over (off) the price", but Moloney never got an invoice or document from Shamrock to confirm the $120,000.00 allowance (See Moloney Testimony, February 1, 2007, p.140).

Pat Burke the principal of LTB Mechanical testified that the $143,771.00 subcontract was paid in full to him by Danny Moloney. He testified as follows:

> Q:    "All right.  Did you determine whether or not you were paid in full for this project?"
>
> A:    "Yes, I am paid in full."

Q:    "And can you tell me, did you check your records as to who paid you?"

A:    "Yes."

Q:    "And who did you determine paid you in full for your project?"

A:    "Danny Moloney."
      (See Pat Burke Testimony, February 1, 2007, p.5)

The Respondent is entitled to a credit and/or refund in the sum of $143,771.00.


### THE RESPONDENT IS LITIGATED DAMAGES DUE TO THE CLAIMANT'S FAILURE TO TIMELY COMPLETE THE WORK

Article 2.3 of the AIA Contract provides that the Contractor "shall achieve substantial completion of the entire work not later than 150 days from the date of commencement" and provides for liquidated damages of $100.00 per day for each date thereafter (See Contract - Exhibit "C-4").

Claimant's Jay Morehouse stated the commencement date was January 25, 2004 (See Morehouse Testimony, November 28, 2006, p.659).

Claimant's Seamus Burke conceded that Shamrock had 150 days to complete the work and that the deadline was not met.

Q:    "How much time did you have to complete the job?"

A:    "150 days."

Q:    "Did you complete the job within 150 days?"

A:    "No."
      (See S. Burke Testimony, November, 14, 2005, p.241-242)

20

Seamus Burke testified that the job was "completed in the latter part of '04" (see s. Burke Testimony, November 14, 2006, p.242).

Seamus Burke added that "beginning of November I think that job was probably what you would call substantially completed" (See S. Burke Testimony, November 14, 2006, p. 244).

Paragraph 14.5.1 of the A.I.A. Contract requires the contractor to send out written notice that the work was ready for final inspection (See Contract - Exhibit "C-4")

Seamus Burke testified "we didn't send notification to Mr. Moloney" (See S. Burke Testimony, November 14, 2006, p. 244).

Paragraph 14.5.2. of the A.I.A. Contract states that "final payment shall not become due until the contractor has delivered to the owner a complete release of all liens arising out of this Contract or receipts in full covering all labor, materials and equipment for which a lien could be filed, or a bond satisfactory to the owner to indemnify the owner against such lien" (See Contract, Respondent's Exhibit "C-4").

Seamus Burke testified that he neither provided a complete release of all liens nor a bond satisfactory to the owner  (See S. Burke Testimony, November 14, 2006, p. 245-246).

Seamus Burke was asked:

> Q:    "Pursuant tot the Contract, 14.5.2 is it not correct
>        that final payment is still not due at this point?"
>
> A:    "Terms of the Contract, yes."
>
> Q:    "So the final payment is not even due as of today,
>        is that correct?"
>
> A:    "If we're - per the terms of the Contract, yes."
>        (See S. Burke Testimony, November 14, 2006, p.247)

Daniel Moloney testified that the liens are still in place against the premises (See Moloney Testimony, February 1, 2007, p. 161).

Claimant's Jay Morehouse testified that the completion date should have been June 25, 2004 (See Morehouse Testimony, March 28, 2006, p.66).

Jay Morehouse did not know the date Shamrock performed its last work at the project nor the date that the Certificate of Occupancy was obtained (See Morehouse Testimony, November 28, 2006, p.660)

The Mechanics Lien filed by Claimant Shamrock sets forth November 13, 2004 as the last date that Shamrock furnished labor or materials (See Respondent's Exhibit "L").

Daniel Moloney testified that Shamrock failed to pay or credit the Owner/Respondent for liquidated, late payment charges for the period of June 25, 2004 to November 13, 2004 (See Moloney Testimony, February 1, 2007, p. 148).

He noted that Rose Realty Corp. only got the Certificate of Occupancy a few months ago, as it was held up by an elevator violation (See Moloney Testimony, February 1, 2007, p.148-149). See Certificate of Occupancy - Respondent's Exhibit "Y". The effective date is noted as May 9, 2006.

The Respondent is entitled to at very least a $100.00 per day credit from June 25, 2004 to November 13, 2004 (141 days) in the sum of $14,100.00 or a further credit to late 2006 when the Certificate of Occupancy was issued in the appropriate (786 days) sum of $78,600.00.

## SHAMROCK FAILED TO COMPLETE THE WORK
## AND FAILED TO MAKE NECESSARY REPAIRS

Respondent's witness, Mike Neville, an employee of Liffey Van Lines, Inc., the tenant in possession at 234 East 121st Street, New York, New York testified about the failure of Shamrock to make necessary repairs as set forth in the Counterclaim.

Mike Neville took pictures of the doors on the ground floor of the premises. Each photograph showed that the doors did not properly close and left gaps. He testified that wind freely blew in through the openings, water entered the premises through the openings and that the doors did not properly close (See photos Respondent Exhibits "S-1", "S-2", "S-3", "S-4", "S-5" and "S-6".

He further testified that rainwater leaked through the wall on the second floor and the roof. He added that the water caused damage to a customer's stored possessions.

Daniel Moloney testified that Shamrock failed to finish the work. He stated that the fans in the warehouse were not "hooked up yet", "doors going from one warehouse to the other, he never put them in as agreed", "the roof is leaking", "the wall in the front where all the window is leaking" (See Moloney Testimony, February 1, 2007, p.146).

Mr. Moloney stated that the doors can be replaced for $32,000.00, noting "the doors, we've got a price of $32,000.00 to replace them. They've fallen out twice" (See Moloney Testimony, February 1, 2007, p. 146).

Moloney confirmed Mike Neville's statement that wind whips through the doors, stating "There's a three-inch gap on some of the doors where you can see right out

through them" (See Moloney Testimony, February 1, 2007, p.147. See Respondent's Photo's Exhibits Q-1 to Q-9).

These complaints were brought to the attention of Shamrock's Jay Morehouse, but Moloney testified "Morehouse, will yes you to death" (Testimony, p. 147)

Mr. Moloney stated that a recent inspection disclosed that "concrete on the top of the loading dock cracked" --- because "the steel underneath it apparently wasn't braced enough (See Moloney Testimony, p. 154).

Moloney further testified that he has a generator in the basement that was not hooked up. Moloney had a conversation with Seamus Burke with respect to the generator. Burke indicated that the "electrician was supposed to have it up" (See Moloney Testimony, p.162).

Claimant's Jay Morehouse was asked if he hooked up the generator as requested by Moloney. He answered, "I did not" (see Morehouse testimony November 28, 2006, p. 698).

Moloney added that the fans in the warehouse were not hooked up (See Moloney Testimony, p. 162) and that the building roof still leaks (See Moloney Testimony, p. 163)

Mr. Moloney added that Tailored Roofing would not repair the roof as per its warranty noting "tailored roofing told me that Seamus didn't pay them and they were under no obligation to come back and fix it" (See Moloney Testimony, p. 163)

Daniel Moloney further testified that Seamus Burke opened in their original deal "to join all the floors on the adjacent Liffey building" but did not do so (See Moloney Testimony, p. 163).

That by virtue of Shamrock to complete the building and make necessary punch list of other required repairs, the Respondent is entitled to an award of $150,000.00.

## THE CONTRACT DOES NOT PROVIDE
## FOR AN AWARD OF ATTORNEYS FEES OR COSTS

Neither the Contract nor its "Claims and disputes" provision provide for an award of Attorneys fees or costs (See Contract, Exhibit "C-4" " and Claims and Disputes Provision, Article 9.10.

Further, Article 9.11 states that "the contractor and owner waive claims against each other for consequential damages arising out of or relating to this Contract."

In general, unless authorized by a contractual provision or statute, Attorneys fees and costs are not available in arbitration proceedings.

The Courts in New York have consistently ruled out that Attorneys fees and costs may not be recovered in a voluntary arbitration proceeding unless specifically provided for in the arbitration agreement.  Myron Assoc. v. Obstfeld, 224AD2d504, 638 N.Y.S. 154.  There is no such provision in the arbitration provision in the instant case.

In a like manner, New York Courts have hold that arbitration proceeding pertaining to collective bargaining agreements cannot result in an award of Attorney's fees without a specific provision allowing Attorney's fees.  Meehan v. Nassau Community College, 242AD2d155, 675 N.Y.S. 2d.354.

Without a specific agreement for Attorneys fees, none can be awarded.

In a like manner an award of costs by an arbitrator unless provided by agreement or statute is involved.  4AM Jur 2d, Alternative Dispute Resolution, p.204.

For the reasons stated, no award for costs or attorneys fees should be awarded to either party.

## CONCLUSION

For the reasons stated, the claim should be dismissed in its entirety and the counterclaim should be granted to the extent of the amount of the still pending mechanic's liens, the credit due from the LTB Mechanical subcontract, the daily liquidated damages due to the late completion of the work and for repairs that must still be made.

Dated: New York, New York

March 27, 2007

Respectfully Submitted,
Agulnick & Gogel, LLC
*Attorneys for Respondent*
321 Broadway - 2nd Floor
New York, New York 10007
(212) 233 - 9500

By _____
William A. Gogel

26